# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Daniel'la Deering,

               Plaintiff,

v.

Lockheed Martin Corporation,
a Maryland corporation,
Maryanne Lavan, an individual, and
Kenneth Bastian, an individual,

               Defendants.

Court File No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Daniel'la Deering, for her Complaint against Defendant Lockheed Martin Corporation, Maryanne Lavan and Kenneth Bastian, states and alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, Title I of the Civil Rights Act of 1991, the Civil Rights Act of 1886, the Equal Pay Act of 1963, and the Minnesota Human Rights Act to remedy and correct unlawful employment practices on the basis of her race, African American, for unequal pay on the basis of her sex, and in retaliation for making an internal complaint of race discrimination and for filing a charge of race discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

2.     Plaintiff alleges that Defendant Lockheed Martin  Corporation subjected her to different and unequal terms and conditions of employment during her 16 year career in Lockheed Martin's Legal Department, including without limitation unequal pay, denial of promotional opportunities, discriminatory performance evaluations, and other practices on the basis of her

1

race and in the case of her compensation also on the basis of her sex, female. Plaintiff further alleges that after Plaintiff made an internal complaint of race discrimination in her employment and filed a charge of race discrimination in her employment with the U.S. Equal Opportunity Commission, Lockheed Martin unlawfully terminated her employment in violation of Title VII and the MHRA.

3.      Plaintiff also alleges that Defendants Maryanne Lavan and Kenneth Bastian, individually and as employees of Defendant Lockheed Martin Corporation, aided and abetted Lockheed Martin in its racial discrimination against Plaintiff, published false statements that they purported to be factual, that were harmful to the reputation of Plaintiff. These statements made by Defendants Lavan and Bastian were communicated to third parties and were not made on a proper occasion, for a proper purpose or based on reasonable or probable cause. These communications were knowingly false and were made for the purpose of harming Plaintiff's reputation and in fact did cause harm to Plaintiff.

4.      The extreme and outrageous intentional conduct of the Defendants Lavan and Bastian also caused Plaintiff severe emotional distress.

## JURISDICTION AND VENUE

5.      Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981, *et seq.,* the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.*, the Minnesota Human Rights Act, Minn. Stat. § 363A.01, *et seq.* and common law.

6.      This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1332, 1343(a)(4), and 1367.

7.      Venue is proper in this district for the claims under 42 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to all claims asserted occurred within the jurisdiction of the United States District Courts for the District of Minnesota.

## PARTIES

8.      Plaintiff is an African American female citizen and resident of the State of Minnesota.  She was employed for sixteen (16) years and eight (8) months by Lockheed Martin Corporation in its heritage Rotary and Mission Systems ("RMS") Division, located in Dakota County, Minnesota.

9.      Defendant Lockheed Martin Corporation is a Maryland corporation with its principal place of business in Bethesda, Maryland, and employs approximately 110,000 employees worldwide.

10.      Defendant Maryanne Lavan is the current General Counsel for Lockheed Martin and is a resident of the State of Maryland.

11.      Defendant Kenneth Bastian is a resident of the State of Virginia and is currently Vice President, Associate General Counsel, Environmental, IP and Real Estate within Lockheed Martin's Legal Department. Mr. Bastian is the former Vice President, Associate General Counsel of Lockheed Martin's Rotary and Mission Systems line of business where he served as Plaintiff's direct supervisor.

## EXHAUSTION OF REMEDIES

12.      Plaintiff exhausted her administrative remedies pursuant to 42 U.S.C. § 2000e-5(f). She filed a charge of discrimination against Lockheed Martin with the EEOC and charge was cross-filed with the Minnesota Department of Human Rights pursuant to a work-sharing agreement. On April 8, 2020, the EEOC issued to Plaintiff a Notice of Right to Sue.

3

## FACTUAL BACKGROUND

13.    Plaintiff, an African American female licensed attorney at law, was employed by Defendant Lockheed Martin as an attorney serving the company's RMS Division where she was employed for sixteen (16) years and eight (8) months. During her employment at Lockheed Martin, Plaintiff held positions of Assistant General Counsel, and General Counsel.  While serving in her role as General Counsel, with no change in pay or benefits, Plaintiff's job duties were realigned, and her title amended to Deputy General Counsel and General Counsel – Labor and Employment Law. No reason was given to her for this realignment and retitling.

14.    During Plaintiff's tenure at Lockheed, the line of business and/or business divisions that Plaintiff supported (NE&SS, Tactical Systems, MS2, MST, RMS) – were all RMS heritage organizations.  RMS was one of four core business divisions that comprised Lockheed Martin.  According to Lockheed Martin's annual reports, the heritage lines of business and later the RMS division that Plaintiff supported were consistently second and later first in terms of profitability based on sales within Lockheed Martin, with annual sales ever increasing year-over-year from approximately $2 billion as a heritage line of business to $14 billion as the RMS division at the time of Plaintiff's termination.

15.    During Plaintiff's tenure, the size of the legal department ranged, on information and belief, from roughly 145 to 180 attorneys.  During Plaintiff's tenure, the Lockheed Martin General counsel role was held by Frank Menaker, James Comey and Maryanne Lavan (all Caucasians).  There were initially five core business areas led by five vice president general counsel known as  the "Big 5" (all Caucasian) and that later became four core lines of business led by four Vice President, General Counsels, (all Caucasian) who along with about 8 - 10 other subject matter area vice presidents (only one African American hired by James Comey) reported

4

directly to the Lockheed Martin General Counsel.  Those business area General Counsels had

roughly 8 to 12 line of business/program or subject matter General Counsels – Level 7 reporting

to them. Some of those of those subject matter General Counsels had assistant/associate general

counsels or other staff reporting to them as managers.  Other subject matter General Counsels

were promoted "in-line" with no management responsibilities.

16.    On information and belief, at the time of Plaintiff's hire, there were approximately

350 African American Vice Presidents and Directors across the corporation.  On information and

belief, at the time of Plaintiff's termination there were less than 50 across the entire corporation.

The number of African American attorneys in the legal department during Plaintiff's tenure was

approximately five at time of plaintiff's hire to a high of 11, including, Plaintiff, at the time of

Plaintiff's termination. At the time of Plaintiff's hire there was one African American Vice

President in the legal department and no African American Level 7 General Counsels.  At the

time of Plaintiff's termination there was still only one African American Vice President (a

different person than at the time of Plaintiff's hire), and approximately six African American

Level 7 General Counsels.

17.    During her employment, Plaintiff has been subjected to disparate treatment due to

the systemic institutional and pervasive racism within all of Lockheed Martin in numerous

respects, all of which adversely affected all of her terms and conditions of employment, and

personally in terms of her emotional well-being and professional opportunities outside of

Lockheed Martin.

18.    This disparate treatment evidenced a pattern and practice of race discrimination

against Plaintiff, comprising a continuing violation of Title VII, § 1981 and the Minnesota

Human Rights Act. This pattern and practice involved a large number of similar discriminatory

acts beginning with her hire and running through the termination of her employment, systemic violations throughout her employment, and discriminatory acts which led to and formed the basis for Plaintiff's formal internal and external complaints of race discrimination and which manifested in adverse effects of past discrimination during the final year of Plaintiff's employment in Plaintiff's compensation, grade level, title, opportunities for advancement, and other terms and conditions of her employment.

19.     In April 2002, Plaintiff was hired by Alice Eldridge, a Caucasian female, General Counsel at the RMS Eagan office, in the role of Assistant General Counsel, Level 4 (General Attorney Senior Staff – Level 4). At the time of hire, Plaintiff not only was a licensed attorney, but had a Master's Degree in Public Administration, nearly eight years of legal work experience as in-house counsel, at a law firm and a judicial clerk, and nearly six years of full time, professional work experience gained while working through undergraduate and graduate school.

20.     Plaintiff's work duties as assistant general counsel were very broad and required Plaintiff to work on significant matters and very autonomously. Plaintiff provided legal advice and support to the contracts department and proposal/subcontracts teams – working on small to extremely large domestic and international contracts and proposals and any resulting litigation/audits/protests, working on regulatory issues related to government contracts, domestic/international consultants, export control, intellectual property, data security/privacy, responding to employment law/medical services/risk management issues as well as resulting charges/litigation, training employees and managers on legal issues, managing outside counsel, working on corporate-wide legal project teams and a numerous other responsibilities.

21.     Plaintiff enjoyed the variety of work, her colleagues, and the employee/clients she supported.

22.     About a year after her hire, Plaintiff discovered there no other attorneys with her years of experience at salary level 4.  Plaintiff was performing very well in her role and won a recognition award for her legal support of developing a new subcontract labor contracting process.  After demonstrating her ability as a hard worker and adept legal advisor, Plaintiff discussed her concerns about her level in her performance discussions with Ms. Eldridge.

23.     In 2004, Ms. Eldridge who reported to Mr. Bastian, was promoted to Vice President, General Counsel of one of the RMS heritage lines of business in Owego, New York after having been General Counsel of the Eagan, Minnesota RMS office for approximately 18 months.

24.     At the time of Ms. Eldridge's promotion, Plaintiff was designated "acting" General Counsel – with no change in pay or benefits.  Plaintiff acted in that role for approximately three months.  At that time, Lockheed Martin did not and does not internally post any positions that are director level and above and Ms. Eldridge's position was not posted. Plaintiff made her interest in the General Counsel RMS Eagan position known to the RMS Human Resources Director at the time, Ms. Darlene Weiss, and to Mr. Bastian.

25.     Plaintiff was not interviewed or otherwise considered in the selection process for the General Counsel RMS Eagan position.  Unbeknownst to Plaintiff, a peer attorney of hers, Kevin Darrencamp, a Caucasian male, an Assistant General Counsel working in another Lockheed Martin heritage RMS office in Orlando, FL, was promoted to take the position vacated by Ms. Eldridge.

26.      Mr. Darrencamp had been reporting to Edith Jones, one of only three (including Plaintiff) African American females in the entire Lockheed Martin Legal Department and the only African American Vice President in the legal department at the time.  Ms. Jones became a

Vice President in the Lockheed legal department as a result of the merger between Lockheed and

Martin Marietta corporation, not due to a promotion within the Lockheed legal organization.

27.     When Plaintiff inquired as to why she was not included or considered in the

selection process, Ms. Weiss advised her that she would look into it.  Plaintiff later discovered

that she had simply been excluded from the process and was never provided an explanation.

28.     Once Mr. Darrencamp became her immediate supervisor, Plaintiff repeated her

concerns and objections regarding her level not reflecting her skills, experience, and performance

since hire.

29.     Late in 2004, Plaintiff received an inline "promotion" to level 5 (General

Attorney Senior Staff – Level 5).

30.      In 2006, after approximately 24 months in the job, Mr. Darrencamp, who had

relocated from Florida to take the position in Eagan, and had made it known for over a year that

he wanted to return to Florida to be closer to his family, was promoted to Ms. Jones's position in

Florida, which became open after management asked for her resignation. Mr. Bastian facilitated

Mr. Darrencamp's relocation and placed him in Ms. Jones' Vice President position. This left the

General Counsel position open again in Eagan.

31.     Plaintiff was again designated "acting" General Counsel, RMS Eagan, with no

change in pay or benefits.  Plaintiff was told that she would need to "act" in the role before a

determination could be made on whether she would be considered for the General Counsel role.

This was despite the fact that Plaintiff had held the role previously and was handling all the

duties of the position prior to Mr. Darrencamp's official transition to his job new Vice President

job in Florida.

8

32.     Plaintiff continued as "acting" General Counsel for nearly nine (9) months.  Other Caucasian employees at all levels across the corporation had not been required to "act" in a position for that long of a time period as one is performing the duties of the job without receiving the pay and benefits that go along with the position.  Coincidentally, at the same time Plaintiff was "acting" in the General Counsel role in Eagan, two (2) Caucasian employees, Mary Leopold and Michael Hollman had been acting in Director level positions – Ms. Leopold as "acting" Finance Director and Mr. Hollman as "acting" Director of Contracts.  Both Ms. Leopold and Mr. Hollman were both installed permanently in their respective positions months before Plaintiff was offered the General Counsel position on a permanent basis.  Both Ms. Leopold and Mr. Hollman were offered their positions at the Director level – Level 7, and with Director pay which includes Management Incentive Compensation (MICP) and Long-Term Incentive compensation (LTI) which is part of the standard compensation package for director level employees across Lockheed.

33.     After having acted in the General Counsel role for nearly nine (9) months, and with Plaintiff making regular inquiries to Mr. Bastian as to when a decision might be made about her being permanently named to the role, Mr. Bastian, in first quarter of 2007, contacted Plaintiff to discuss the General Counsel role.

34.     Mr. Bastian told Plaintiff that the leadership team believed that Plaintiff had done a great job in an acting capacity.  However, Mr. Bastian indicated that leadership the team was looking at "realigning and down-leveling" several positions in the organization and that this General Counsel role was one they were looking to down-level.  Mr. Bastian also told Plaintiff there were concerns about her "skipping a level" from 5 to 7 (the level of Director positions).

35.     Plaintiff told Mr. Bastian that he should be well aware that many people had been promoted and skipped levels across the corporation.  Plaintiff also asked Mr. Bastian why this General Counsel role would be down-leveled to a level 6, when all of his other General Counsel direct reports were at a level 7 (and all of them were Caucasian).  Plaintiff also questioned why this role had been at level 7 when the three (3) previous General Counsels held the position (Richard Marchek, Alice Eldridge and Kevin Darrencamp – all Caucasian) but now that it was being offered to her, it was the only General Counsel position being down leveled within RMS and within the corporation.  Mr. Bastian told Plaintiff that he would discuss it with his leadership and get back to her.

36.     A day or so later, Mr. Bastian contacted Plaintiff and told her they planned to offer her the position, and were going to keep the position at Level 7, but the position would not be eligible for MICP as they had removed the incentive compensation component from this Level 7 position only and Plaintiff would have to wait at least a year to propose to the board of directors through the Lockheed leadership committee to add MICP back to the position.  Plaintiff questioned why incentive compensation "would have been removed" from this specific position in the first place when other Lockheed Director level positions and that position specifically had always had incentive compensation.  Plaintiff further pointed out that both Ms. Leopold and Mr. Hollman, who were recently named to their director roles did not have the incentive compensation removed from their positions and they were all a part of the same business area.

37.     Mr. Bastian, who on information and belief, reported to Jay Brozost, of one of the Big 5 core lines of business, Electronic System Business Area at this time (ESBA – which incorporated heritage RMS), did not add the MICP component back to Plaintiff's compensation until 2007.  Plaintiff was given a 15% MICP percentage amount – the lowest possible MICP

compensation level available and the lowest of the other General Counsels reporting Mr. Bastian and across the legal department.

38.     MICP awards are based on the prior's years performance review rating. The individual rating is based on each person's performance review rating (there are five (5) possible rating levels) and the success of the business area that the employee supports.  Plaintiff's eligibility to receive a MICP award did not become effective until 2008 and since MICP is not paid until the following a full year of performance, Plaintiff did not receive a MICP award until 2009 – a full 3 years after Plaintiff began working in the General Counsel role.

39.     Plaintiff remained at that low level of 15% until 2010 when the corporation did an across the board equity audit based on a number of factors and ongoing complaints about bias in the overall performance management and pay structures.  Based on the outcome of that corporate-wide audit, Plaintiff's MICP percentage amount was raised to 20% beginning in 2011.

40.     Plaintiff's individual rating used to calculate her MICP award was also the lowest possible factor of the range assigned to that rating level.

41.     Director level employees across the corporation are also awarded LTIs which are awarded at the same time MICP is awarded but are not available to the employee for a period of three (3) years after the award. Plaintiff was in her role as General Counsel for 12 years and was only awarded LTIs five times. Plaintiff was only able to collect only three of those awards since she was retaliated against for filing an internal appeal about her review and an external discrimination complaint to the EEOC and terminated before two of the awards could vest.

42.     Beginning in 2010, Lockheed began what would be nearly eight years of reductions in force (RIFs). This initiative began with the closure of the large Eagan facility and a three-year RIF that saw the 1350 employees at that site accept severance, relocate out of state,

work virtually and remain local or relocate to a smaller leased facility in Eagan a short distance from the large facility.  Due to Plaintiff's legal acumen, experience, sound judgment and support, there were no EEOC charges or any resulting litigation from Eagan stemming from the handling of that RIF.

43.     Plaintiff's director peers and other senior level executives who worked on that RIF Project team received the highest rating available in their performance review for that year and accolades within the corporation for their handling of the RIF.  Plaintiff supported that project with no support staff of her own.  That Project was just one assignment among her numerous job tasks.  Yet, Plaintiff only received the second highest rating on the performance scale.

44.     Also, Ms. Lavan, who became General Counsel of Lockheed in June 2010, gives out awards each year at the annual legal offsite for significant legal accomplishments.  Plaintiff received no recognition from Ms. Lavan at the annual offsite or otherwise despite this very significant accomplishment and others during Plaintiff's tenure.  In fact, no African American attorneys have received one of these annual awards from Ms. Lavan during Plaintiff's tenure.

45.     Plaintiff along with a number of employees, transitioned to work 100% virtually. Due to the RIF, Plaintiff lost all of her attorney support (she had two (2) attorneys reporting to her) and two paralegal direct reports but gained a significantly increased workload.

46.     Plaintiff went from supporting a line of business with approximately 2200 employees to a line of business subsumed and expanded from the RIF to include approximately 16,000 employees.  At the time, Plaintiff's title was also changed to Deputy General Counsel. There was no change in pay or benefits, just increased workload to include all the work Plaintiff was already doing.  This included day-to-day advice to internal clients, contract reviews and

proposal support, support of the HR team and medical services and a wide variety of litigation. She now covered far more people with also was given some additional legal administrative projects delegated from Mr. Bastian.  Plaintiff's client group was both domestic and international, with internal clients in 32 states and 24 countries.

47.    Plaintiff's only remaining direct report, her administrative assistant, Billie Jean Schuermann, agreed to expand her duties to include paralegal work to assist Plaintiff in handling the significantly increased workload.  None of Plaintiff's peers supporting larger lines of business were doing so with no internal attorney support.

48.    When Plaintiff asked Mr. Bastian if she could hire an attorney to help support her work, Mr. Bastian indicated he would have to "wait and see" how things were going before he would approach Ms. Lavan about adding headcount.

49.    Plaintiff continued to overachieve despite internal obstacles not faced by her Caucasian peers.  Since 2013, Plaintiff was increasingly handling more matters and a larger litigation caseload compared to her peers.  Plaintiffs had always managed her legal budget well, underrunning it year over year because she was using excellent counsel, that was also extremely diverse, and that did not charge her "firm" rates.

50.    Ms. Lavan, who had never bothered to interact with Plaintiff on any matters she was handling, was routinely critical of Plaintiff's handling of just two cases that did not yield immediate optimal results initially, although one was reversed post-verdict, and the Plaintiff was unfairly pre-empted from managing the second to conclusion.

51.    Ms. Lavan often made disparaging and defamatory remarks to others, but not directly to Plaintiff, regarding these cases, singling out Plaintiff and another African American peer od Plaintiff on a separate matter, while passing over less than optimal results of matters

13

handling by majority attorneys reporting to her. She internally chastised and disparaged both Plaintiff and Plaintiff's long-standing African American and diverse outside counsel, who was a senior partner in her law firm. When Plaintiff and her outside counsel obtained not only a reversal of the adverse verdict, but an award of attorneys' fees for Lockheed Martin (from an individual plaintiff – a rare accomplishment), she praised Mr. Bastian and his "team," without mentioning Plaintiff by name. Ms. Lavan failed to acknowledge Plaintiff at all at the very successful outcome and end of the matter, even though Plaintiff had personally managed that file.

52.     In contrast, whenever Plaintiff's Caucasian attorney peers received unfavorable final judgments in cases or other adverse results in matters, Ms. Lavan did not react in the same outspoken, personally critical manner to their peers and other in the company. When Plaintiff's Caucasian attorney peers received favorable outcomes, Ms. Lavan routinely praised them for their work and results. She never offered praise of Plaintiff results.

53.     With respect to another matter that Plaintiff managed, the result of which clearly was an outlier, Mr. Bastian told Plaintiff that he was "mystified" as to why Ms. Lavan was so bothered by that case, noting that it was not different than any other contract case or other matter. For months after the case was resolved, throughout the year, Ms. Lavan continued to disparage Plaintiff's character within the corporation. She reserved her critical comments to others; Ms. Lavan never spoke directly to Plaintiff about any of these matters or her criticism of Plaintiff's performance. On information and belief, unlike the work of Caucasian lawyers, Ms. Lavan had reports pulled on all Plaintiff's matters and unfairly scrutinized her past work.

54.     If outcomes favorable to the company, that are well managed, cost effective and support the corporate goals, then Plaintiffs accomplishments consistently surpassed expectations

14

and surpass metrics of Plaintiff's other non-minority colleagues at the same level across the enterprise. These colleagues have consistently received better ratings, had higher MICP, more and routine LTI awards, greater compensation, promotions and greater respect and value for the work they perform with great resources and more focus and support of legal leadership.

55.    Plaintiff worked without even minimal staff since the closure of the Eagan facility in 2010.  Plaintiff's title and job duties were changed by Mr. Bastian without her input or knowledge in 2012 to General Counsel – Labor & Employment.  Once Plaintiff was put into the General Counsel L&E role, it became apparent very quickly that she needed to hire an attorney to support the L&E caseload of the heritage RMS businesses to roughly 18,000 employees and to 34,000 employees when RMS acquired Sikorsky Helicopters in 2015.

56.    Plaintiff had discussions with Mr. Bastian routinely over the years asking to add staff to support the work of heritage RMS and have also made mention of this problem in her reviews year over year.  The response she got was always "it's something we need to watch." What "we watched" was a  continuously increasing domestic and international caseload and the requests for advice from Plaintiff's clients.  Case management was only part of Plaintiff's job. There were five to eight consecutive years when RMS was conducting major RIFs across the globe and making acquisitions and expanding sites staffing up major programs, weekly Discipline Review Committee (DRC) meetings, frequent threat assessment cases or other large-scale Ethics or Security issues.  Plaintiff averaged between 20 - 40 new inquiries from the Human Resources team for advice weekly while also supporting broader RMS/enterprise initiatives and many other actions and projects.

57.    Lockheed's legal department tracks all litigation, charges, and significant work projects in an electronic matter management system.  Ms. Schuermann routinely and regularly

updated the matter management system.  In addition to bi-weekly staff meetings and more frequent calls between Mr. Bastian and Plaintiff to discuss any pertinent charges or matters, Mr. Bastian had clear insight at all times into Plaintiff's workload.

58.     Plaintiff's workload was much larger than her other Labor & Employment colleagues across the corporation.  The other Labor & Employment General Counsel's and Labor & Employment Vice President, General Counsel – Susan Dunnings, (the only African American VP in legal – hired from outside the company by General Counsel James Comey during his tenure) all had at least two and sometimes three additional attorneys reporting to them.

59.     Plaintiff discussed her lack of attorney support and disproportionately large workload with Ms Dunnings many times.  Ms. Dunnings was well aware of Plaintiff's workload and lack of attorney and management support as Ms. Dunning lead quarterly meetings with all the L & E attorneys across the corporation.  Ms. Dunnings and Plaintiff also spoke outside of those quarterly calls.  Plaintiff would routinely discuss the lack African American attorneys and employees across the corporation, Mr. Bastian and Ms. Lavan's lack of action to add more African American attorneys to the legal department, promote African Americans to Vice President roles, Plaintiff's and other African American attorney experiences in the legal department, and the experience of African American employees across the company.

60.     Ms. Dunnings encouraged Plaintiff to continue to stress to Mr. Bastian the inequity in the attorney support of other L & E attorneys compared to Plaintiff and compared against Plaintiff's workload among other things.

61.     Both Plaintiff and her administrative assistant, Ms. Schuermann, were working day, night, weekends, and holidays to keep up on all the work.  Plaintiff made a request to Mr. Bastian to approve an iPhone for Ms. Schuermann to better enable her to work on vacation

without having to travel with her laptop.  Ms. Schuermann receiving an iPhone was provided for in the corporate wide asset guide.  Many other administrative assistants within legal had iPhones as well as all the paralegals.  Despite Plaintiff's request and ever-increasing workload and hardship to Ms. Schuermann, Mr. Bastian did not approve Plaintiff's request to approve Ms. Schuermann's iPhone for over 2 years with no explanation other than "he needed to ask around to see how many other admins" had iPhones because he did not "want to set a precedent."

62.     After years of Plaintiff asking Mr. Bastian for attorney support, in 2015, Mr. Bastian got approval from Ms. Lavan to allow Plaintiff to bring on a senior level attorney on loan from one of the law firms Plaintiff worked with on litigation matters to "act in the role" of a level 6.  Despite the fact there was more than enough work for Plaintiff and another attorney, and that Plaintiff's other peer General Counsels had been allowed hire the staff they needed with no obstacles, it took many months before Plaintiff was allowed to extend the loaned attorney an offer.  Because it had taken so long for Mr. Bastian to get Ms. Lavan's approval to extend an offer Plaintiff lost the loaned attorney to another company.  Then Plaintiff was not allowed to look for or select another qualified candidate; instead she was required by Ms. Lavan to hire an internal attorney who was being laid off from another business unit.  This attorney had been interviewed by Plaintiff, HRBP Christina Johnston, HR Director Kara King and Mr. Bastian, and all believed that the attorney did not meet the qualifications or requirements of the position.  Plaintiff was required to hire this person anyway at the direction of Ms. Lavan, who despite having not intervened in the hiring done by any of Plaintiff's peer General Counsel, decided to direct the hiring of an attorney three levels down reporting to Plaintiff.  Plaintiff spent countless hours, months and years working with that attorney who was not functioning at a Level 6. This only added more work to Plaintiff's workload instead of helping to relieve the workload.

63.     Plaintiff's colleagues, many of whom at this time had only recently be promoted into the role of General Counsel as her peers, were readily allowed to be fully staffed and were have been able to hire who they felt were the best candidates, without Ms. Lavan directing them to hire poor internal performers.

64.     Throughout Plaintiff's tenure, she successfully managed large- and small-scale litigation.  Plaintiff had responsibility for and resolved contract disputes, IP cases, government protests, environmental regulatory actions, disputes with local municipalities and employment litigation.  Plaintiff utilized diverse outside counsel to handle many of the matters that Plaintiff managed.  Plaintiff had more wins than losses in all of those categories.

65.     Plaintiff also supported Lockheed's diversity and inclusion initiatives through her actions.  Plaintiff worked with a very diverse team of outside counsel, probably the most diverse of her peer attorneys, to assist with many legal matters.

66.     In addition to having to overcome the constant lack of support from legal leadership, questioning of her abilities with her work, being rated arbitrarily and not based on her accomplishments - which directly affected Plaintiff's total compensation, and lack of recognition for the many successes resulting directly from Plaintiff's legal support, Plaintiff was discriminated against compared to her General Counsel peers.

67.     This was part of a long pattern and practice of race discrimination against Plaintiff. When Plaintiff became GC in 2006, Mr. Bastian's other direct reports were five Caucasians: Attorneys Sandy Fenske, Peter Balch, Phil James, and Wyck Fucron, and also Frank McKeffrey (Director of Export Control). Approximately a year or two later, another Caucasian male, Frank Lamir, a close friend and former military colleague of Mr. Furcron's, was hired from outside the corporation as a General Counsel.  Mr. Lamir was later promoted to Vice

President, General Counsel by Ms. Lavan.  David Goldstaub, a Caucasian male, was brought in as General Counsel at the heritage RMS site in Orlando after Mr. Darrencamp took another Vice President role at corporate legal. Richard Paul, Caucasian male, at the recommendation and assistance of Ms. Fenske (who's line of business he had supported for over 15 years as her outside counsel), was hired as General Counsel to file a new position responsible for international contract support in RMS.  John Stevens, Caucasian male and son of the then Lockheed Martin CEO, Bob Stevens, was promoted to a Level 7 general counsel role after less than two years with the company.  Mr. J. Stevens, Caucasian male, split his time reporting to a Vice President at corporate and also Mr. Bastian while doing work within heritage RMS. Around late 2017, Mr. Paul was promoted to Vice President.  Mr. Paul's general counsel role was filled by Rosemary Ameh, who is of African, but was already a level 7 attorney working at corporate.

68.     Mr. James, Mr Balch and Mr. Furcron decided to retire. Despite the fact that most of Plaintiff's peer attorneys were not supporting lines of business that were as active and successful aggressive as the one Plaintiff supported, Mr. Bastian was consistently rating the majority of those Caucasian employees higher or the same as those employees higher than Plaintiff.

69.     On information and belief, Plaintiff was equally or more qualified to fill any of these Vice President positions.  On information and belief, Plaintiff was equally or more qualified to fill any of these Vice President positions.

70.     Based on information and belief, Lockheed Martin discriminated against Plaintiff on the basis of Plaintiff's race in connection with her compensation. Lockheed Martin employs a merit pay increase system that relies heavily on the Company's performance review system.

19

Disparities in that system have had a negative impact on the merit pay of African American employees, including Plaintiff.  Lower performance review ratings also adversely affect annual MICP and LTI awards made by the Company to director level and above employees.

71.     Lockheed's performance review process is the most important factor that is taken into account in making decisions regarding employee compensation, promotion and other terms and conditions of employment. This performance review process has been the subject of many internal complaints as well as external complaints brought by former and current Lockheed employees due to its discriminatory structure and results as it effects the ratings of African Americans.  This review process is highly subjective, and flawed in design and implementation. Despite having many years where Plaintiff was providing legal support to high profile projects, litigation and matters across heritage RMS and across the corporation supporting many legal initiative and winning awards/accolades in the community that garnered positive recognition for Lockheed, Plaintiff was never rated anything other than Achieve or Exceeded, the level 2 and 3 ratings in the performance management system, despite providing primary legal support to an extremely high volume of legal matters that were detailed in her performance review self-assessments and were acknowledged by Mr. Bastian.

72.     Plaintiff had been providing Mr. Bastian, and other senior legal leaders feedback for years regarding her dissatisfaction with the unfairness in her ratings, salary, level, and work conditions.  Plaintiff refused to  sign any performance reviews beginning in 2014, because of Mr. Bastian's failure to provide substantive feedback in response to her requests for specific guidance on what she would need to change to improve her performance and to earn the performance rating she wanted to achieve.

73.     On information and belief, evidence will show that Plaintiff's performance scores underrate her performance results compared with her peers. Based on information and belief, ratings are not fairly given and often are not based on any tangible accomplishments of the employee, adversely affecting Plaintiff and other African American employees.

74.     At the outset of her performance review discussion in 2015, Mr. Bastian began the discussion by stating "well I can tell you that you are not getting a SE", although he did not explain why and provided no feedback.  What Mr. Bastian said during a staff meeting in 2015 and during her performance discussion was that he had never given her anything less than what the system recommended, implying that he had no involvement or power to assign ratings to his employees as he saw fit.

75.     In 2017, Plaintiff received a salary equity adjustment which confirmed her belief that Plaintiff had been paid lower than her Caucasian colleagues since her hire.

76.     Mr. Bastian's performance review recommendations supported Plaintiff's peer colleagues. Mr. Bastian and Ms. Lavan actively supported the career advancement of many of Plaintiff's Caucasian colleagues by selecting them to fill Vice President roles when they became available.

77.     Lockheed Martin discriminated against the Plaintiff based on Plaintiff's race by directly and indirectly denying her promotional opportunities. Throughout the course of her career, including 2018, Lockheed Martin denied Plaintiff promotional opportunities and other opportunities for advancement that were offered to Plaintiff's Caucasian peers.

78.     Lockheed Martin also paid male employee higher wages than Plaintiff and other female employees performing equal work on jobs requiring equal skill, effort, and responsibility.

The work performed by Plaintiff and other female employees was performed by them under similar working conditions.

79.     Lockheed has a policy of not posting any jobs at the Vice President level or higher.  Plaintiff would have no knowledge of when Vice President positions were open because they are not posted. Plaintiff could not apply to a Vice President position. In the legal department, Ms. Lavan made all candidate selections and hires for Vice President opportunities. Since Ms. Lavan has been General Counsel, she has filled at least seven Vice President openings, all with Caucasian employees: three of them peers of Plaintiff in her business unit, three of them Plaintiff's peers in other Lockheed Martin business areas, and one recruited from outside Lockheed Martin.

80.     Despite Lockheed's professed commitment to equal employment opportunities and diversity and inclusion, Ms. Lavan has never hired or promoted an African American to a Vice President position in the legal department.  Of the 15 African American attorneys who were in the legal department prior to Plaintiff's termination, Plaintiff was one of three of the longest serving. Of these attorneys, only Plaintiff and one other were General Counsel, Level 7's and the third  is still only a Level 6 despite having been at Lockheed for 15 years in the legal department. Three other African American, General Counsel level 7 employees have much less tenure in their level 7 roles than Plaintiff.

81.     In 2015, Lockheed Martin acquired Sikorsky Aircraft Corporation. At the time Sikorsky was acquired, Mr. Bastian, both at a staff meeting and in a later discussion with Plaintiff, stated that the Sikorsky attorneys would report within Sikorsky in the near term, but over time they would likely report up to Mr. Bastian. Mr. Bastian advised Plaintiff that the

Sikorsky lawyers would be integrated into Lockheed Martin's legal department, with no adverse impact or effect on incumbent Lockheed Martin attorneys.

82.     Sometime later, Mr. Bastian reported that one of Plaintiff's peers would be promoted to Vice President, General Counsel of Sikorsky and would oversee the attorneys supporting the business. Mr. Bastian went on to say, that the Sikorsky attorneys supporting the functional areas indeed would report up through him.  This resulted in the integration of Sikorsky's legal Department into Lockheed Martin's legal department.

83.     At some point in 2016, the Securities and Exchange Commission finalized and closed the deal between Lockheed and Sikorsky. Lockheed Martin human resources began evaluating all the Sikorsky personnel to fit them into the Lockheed Martin job and pay scales. Based on information and belief, Doug Bartnik, a Caucasian associate level attorney at Sikorsky supporting Labor & Employment, was leveled up to be a Level 7 within the Lockheed Martin system.

84.     On December 21, 2017, Mr. Bastian told Plaintiff, in no uncertain terms that she would be required to compete against Mr. Bartnik for her job as RMS Labor & Employment Counsel.  This was contrary to what Plaintiff had been told earlier, and despite the fact that the Mr. Bartnik had been one job classification lower, had lesser experience and Plaintiff and Plaintiff was currently in that position. The Sikorsky attorney had only recently been promoted to a director level position for no other reason than to place him into Plaintiff's job classification, without which he would not have been qualified to compete for Plaintiff's position.

85.     In March 2018, Defendants presented Plaintiff with her performance review for 2017. That review included numerous factually false statements and rated her below what her performance clearly merited. As had been the case in all of Plaintiff's past reviews, Defendants

rated her one performance rating below what her work deserved. Similarly situated non-African American employees with comparable or lower levels of performance on their deliverables were graded on a much more lenient curve than Plaintiff, including ratings of Significantly Exceeded, reserved by company policy for a "rare level" of "distinguished performance results," for results that were neither rare nor distinguished. This unfair and discriminatory performance review, like the others before it, resulted in an adverse impact on Plaintiff's merit compensation and equity awards.

86.     The false and defamatory statements include, without limitation, statements that Plaintiff did not communicate with stakeholders more effectively, did not inform others in the legal department on the progress of matters, did not take accountability for matters assigned to her, and did not take responsibility for an adverse jury verdict or undertake measures necessary to mitigate. These false and defamatory statements were communicated to others both inside and outside of Lockheed Martin. These factual assertions are false and harmful to Plaintiff's reputation.

87.     Other false and defamatory allegations regarding Plaintiff's handling of one matter, the details of which Defendant claims comprise confidential information, were made by Defendants Bastien and Lavan, were communicated to others both inside and outside of Lockheed Martin. These factual assertions are false and harmful to Plaintiff's reputation.

88.     On May 5, 2018, Plaintiff filed an internal appeal of her performance review per company policy. In that appeal, Plaintiff highlighted the factual inaccuracies in the review and formally complained of race discrimination in her employment which adversely affected her performance ratings, her compensation, her title, grade level, opportunities for advancement, and other terms and conditions of her employment. Defendants affirmed the performance review in

its entirety without complying with Lockheed Martin's internal policies and procedures for handling performance review appeals.

89. On April 27, 2018, Mr. Bastian told Plaintiff that he would be setting things up for her to compete for her job because "they were making him compete all the roles." Mr. Bastian said Plaintiff needed to show Chris Wronsky, Vice President of HR, that she could "add value to the organization."

90. Plaintiff was the only attorney of her peers that was required to compete for her own job with a Sikorsky attorney. Frank McKeffrey, Director of Export control – and not an attorney, and direct report to Mr. Bastian was also asked to compete for his job. Mr. McKeffrey had communicated to Plaintiff that although he had been asked to compete for his job, Mr. Bastian had assured him he had nothing to worry about and he "just needed to go through the motions." Mr. Bastian provided no such assurances to Plaintiff.

91. On May 5, 2018, Plaintiff filed an internal appeal of her 2017 performance review per company policy. In that appeal, Plaintiff highlighted the factual inaccuracies in the review and formally complained of race discrimination in her employment which adversely affected her performance ratings, her compensation, her title, grade level, opportunities for advancement, and other terms and conditions of her employment. Defendants affirmed the performance review in its entirety without complying with Lockheed Martin's internal policies and procedures for handling performance review appeals.

92. On November 13, 2018, Plaintiff filed a charge of race discrimination with the EEOC.

93. On December 7, 2018, Rob Spencer, Ms. Lavan's Deputy General Counsel "suspended" Plaintiff with pay, pending what Lockheed Martin characterized as an investigation

into Plaintiff's use and reference to certain Lockheed Martin documents in pursuing Plaintiff's rights under Title VII the MHRA, including her use of such information in her November 13, 2018, charge of race discrimination against Lockheed Martin. Lockheed Martin contended that certain of the information submitted by Plaintiff to the EEOC included Lockheed Martin confidential information.

94.    The contested information did not include Lockheed Martin confidential information.

95.    Mr. Spencer is not a Labor & Employment attorney and did not follow the process of the internal Discipline Review Committee (DRC) in handling the alleged discipline charge with Plaintiff consistent with other cases with similar allegations.

96.    Despite the fact that information submitted in a charge of discrimination to the EEOC is itself confidential information, and that the documents did not contain Lockheed Martin confidential information, Plaintiff agreed to her employer's demand, contacted the EEOC and made arrangements to withdraw the charge of discrimination in its entirety, and file an amended charge of discrimination that included no direct reference to the information that Lockheed Martin characterized as confidential.

97.    Notwithstanding Plaintiff's compliance with Lockheed Martin's directive, on January 27, 2018, Lockheed Martin terminated Plaintiff's employment.

98.    Lockheed Martin terminated Plaintiff's employment in retaliation for her internal complaints of race discrimination and for filing a charge of race discrimination with a government agency, namely, the U.S. Equal Employment Opportunity Commission.

99.     As a result of Lockheed Martin's discriminatory and retaliatory conduct, Plaintiff

has been damaged in an amount to be proven at trial, but reasonably believed to be in excess of

$75,000.

## COUNT I

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF RACE
### 42 U.S.C. § 2000e, *et seq.*
### (Defendant Lockheed Martin)

100.    Plaintiff restates and realleges the allegations of each preceding paragraph as if

fully set forth herein.

101.    Lockheed Martin intentionally discriminated against Plaintiff in Plaintiff's terms

and conditions of employment, including but not limited to, Plaintiff's compensation, promotion,

opportunities for advancement, performance assessment and other terms and conditions of

employment.

102.    Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer to discriminate

against any employee with respect to that employee's compensation, terms, conditions, or

privileges of employment, because of such employee's race.

*103.*    Lockheed Martin's conduct as stated herein constituted race discrimination and is

a direct violation of 42 U.S.C. § 2000e, *et seq.*

104.    As a direct and proximate result of Lockheed Martin's unlawful acts of

discrimination against Plaintiff, Plaintiff has suffered and continues to suffer economic harm,

lost earnings and benefits, embarrassment, damage to reputation, humiliation,  emotional

distress, and other harm.

105.    Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages,

compensatory damages, back pay, front pay, attorney's fees, punitive damages, costs, and other

legal and equitable relief, all as provided for by Title VII, in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

## COUNT II

## EMPLOYMENT DISCRIMINATION ON THE BASIS OF RACE
### 42 U.S.C. § 1981
### (Defendant Lockheed Martin)

106.    Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

107.    Lockheed Martin intentionally discriminated against Plaintiff in Plaintiff's terms and conditions of employment, including but not limited to, Plaintiff's compensation, promotion, opportunities for advancement, performance evaluation  and other terms and conditions of employment

108.    Under 42 U.S.C. §1981, *et seq.* it is unlawful for an employer to discriminate against an employee with respect to that employee's compensation, terms, conditions, or privileges of employment, because of such employee's race.

109.    Lockheed Martin's conduct stated herein constituted race discrimination and is a direct violation of 42 U.S.C. § 1981, *et seq.*

110.    As a direct and proximate result of Lockheed Martin's unlawful acts of discrimination against Plaintiff, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation,  emotional distress, and other harm.

111.    Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages, compensatory damages, back pay, front pay, punitive damages, attorney's fees, expert witness

fess, costs, and other equitable relief, all as provided for by § 1981, in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

## COUNT III

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF RACE
**Minn. Stat. § 363A.01, *et seq.***
**(Defendant Lockheed Martin)**

112.    Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

113.    Lockheed Martin intentionally discriminated against Plaintiff in Plaintiff's terms and conditions of employment, including but not limited to, Plaintiff's compensation, promotion, opportunities for advancement, performance assessment and other terms and conditions of employment

114.    Under the Minnesota Human Rights Act, Minn. Stat. § 363.01 *et seq.,* it is unlawful for an employer to discriminate against any employee with respect to that employee's compensation, terms, conditions, or privileges of employment, because of such employee's race.

115.    Lockheed Martin's conduct stated herein constituted race discrimination and is a direct violation of Minn. Stat. § 363.01 *et seq.*

116.    As a direct and proximate result of Lockheed Martin's unlawful acts of discrimination against Plaintiff, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other harm.

117.    Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages, compensatory damages which may be doubled or trebled, back pay, front pay, attorney's fees, costs, and other equitable relief, all as provided for by the Minnesota Human Rights Act.

118.     As a result of Lockheed Martin's  discriminatory and retaliatory conduct, Plaintiff

has been damaged in an amount to be proven at trial, but reasonably believed to be in excess of

$75,000.

## COUNT IV

## RETALIATION
**42 U.S.C. § 2000e, *et seq.***
**(Defendant Lockheed Martin)**

119.     Plaintiff restates and realleges the allegations of each preceding paragraph as if

fully set forth herein.

120.     In May 2018, Plaintiff filed an internal complaint of race discrimination in

connection with her employment.

121.     On November 13, 2018, Plaintiff filed a charge of race discrimination against

Lockheed Martin with the EEOC complaining that Lockheed Martin intentionally discriminated

against Plaintiff in Plaintiff's terms and conditions of employment, including but not limited to,

Plaintiff's compensation, promotion, opportunities for advancement, performance assessment

and other terms and conditions of employment.

122.     Under 42 U.S.C. § 2000e-3, it is unlawful for an employer to discriminate or

retaliate against an employee because that employee has opposed any practice made an unlawful

employment practice under Title VII.

123.     Lockheed Martin's conduct stated herein constituted race discrimination and is a

direct violation of 42 U.S.C. § 2000e, *et seq*.

124.     As a direct and proximate result of Lockheed Martin's unlawful acts of

discrimination against Plaintiff, Plaintiff has suffered and continues to suffer economic harm,

lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other harm.

125.     Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages, compensatory damages, back pay, front pay, attorney's fees, costs, and other equitable relief, all as provided for by Title VII, in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

**COUNT V**

**<u>RETALIATION</u>**
**42 U.S.C. § 1981 *et seq.***
**(Defendant Lockheed Martin)**

126.     Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

127.     In May 2018, Plaintiff filed an internal complaint of race discrimination in connection with her employment.

128.     On November 13, 2018, Plaintiff filed a charge of race discrimination against Lockheed Martin with the EEOC complaining that Lockheed Martin intentionally discriminated against Plaintiff in Plaintiff's terms and conditions of employment, including but not limited to, Plaintiff's compensation, promotion, opportunities for advancement, performance evaluation and other terms and conditions of employment.

129.     Under 42 U.S.C. § 1981, it is unlawful for an employer to discriminate or retaliate against an employee because that employee has opposed any practice made an unlawful employment practice under § 1981.

130.     Lockheed Martin's conduct stated herein constituted race discrimination and is a direct violation of 42 U.S.C. § 1981, *et seq.*

131.     As a direct and proximate result of Lockheed Martin's unlawful acts of discrimination against Plaintiff, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other harm.

132.     Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages, compensatory damages, back pay, front pay, punitive damages, attorney's fees, expert witness fess, costs, and other equitable relief, all as provided for by § 1981, in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

## COUNT VI

### REPRISAL DISCIMINATION
### Minn. Stat. § 363A.15
### (Defendant Lockheed Martin)

133.  Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

134.  In May 2018, Plaintiff filed an internal complaint of race discrimination in connection with her employment.

135.  On November 13, 2018, Plaintiff filed a charge of race discrimination against Lockheed Martin with the EEOC complaining that Lockheed Martin intentionally discriminated against Plaintiff in Plaintiff's terms and conditions of employment, including but not limited to, Plaintiff's compensation, promotion, opportunities for advancement, performance assessment and other terms and conditions of employment.

136.  As a direct and proximate result of these complaints, Lockheed Martin unlawfully terminated its employment of Plaintiff in reprisal for Plaintiff's internal and external complaints of race discrimination.

137.  Under the Minnesota Human Rights Act, it is  an unfair discriminatory practice for an employer to intentionally engage in any reprisal against any person because that person opposed a practice forbidden under the Minnesota Human Rights Act  or because that person has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act.

138.  Lockheed Martin's conduct stated herein constituted reprisal discrimination and is a direct violation of Minn. Stat. § 363.15.

139.  As a direct and proximate result of Lockheed Martin's unlawful acts of reprisal against Plaintiff, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other harm.

140.    Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages, compensatory damages, back pay, front pay, attorney's fees, costs, and other equitable relief, all as provided for by the Minnesota Human Rights Act, in an amount to be proven at trial but reasonably believe to be in excess of $75,000.


### COUNT VII

### VIOLATION OF THE EQUAL PAY ACT
**29 U.S.C. § 206**
**(Defendant Lockheed Martin)**

141.    Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

142.    Under the Equal Pay Act,  it is unlawful for an employer to discriminate against an employee with respect to that employee's compensation because of such employee's sex.

143.    Throughout Plaintiff's employment, Lockheed Martin paid male employee higher wages than Plaintiff and other female employees performing equal work on jobs requiring equal skill, effort, and responsibility.

144.    The work performed by Plaintiff and other female employees was performed by them under similar working conditions.

145.    Lockheed Martin' discrimination against Plaintiff on the basis of Plaintiff's sex in Plaintiff's compensation was a violation of the Equal Pay Act, 29 U.S.C. § 206.

146.    As a direct and proximate result of Lockheed Martin's unlawful acts of discrimination against Plaintiff, Plaintiff has suffered and continues to suffer economic harm, lost earnings, and benefits.

147.    Accordingly, Lockheed Martin is liable to Plaintiff for pecuniary damages, compensatory damages, back pay, front pay, attorney's fees, costs, and other equitable relief, in an amount to be proven at trial but reasonably believed to be in excess of $75,000.

## COUNT VIII

### AIDING AND ABETTING DISCIMINATION
### Minn. Stat. § 363A.15.
### (Defendants Lavan and Bastian)

148.     Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

149.     At all times relevant, Defendants Lavan and Bastian served in decision-making and decision-influencing positions over Plaintiff's ongoing employment, future employment, performance evaluation, compensation, opportunities for advancement and other terms and conditions of employment.

150.     Defendants Lavan and Bastian were the agents through whom Lockheed Martin discriminated against Plaintiff on the basis of her race and retaliated against Plaintiff for opposing race discrimination in her employment.

151.     Defendants Lavan and Bastian each committed unfair discriminatory practices in violation of the Minnesota Human Rights Act, Minn. Stat. § 363.14 by intentionally aiding, abetting, inciting, and compelling a person to engage in any of the practices forbidden by the Minnesota Human Rights Act this chapter, and attempting to do so.

152.     Defendants Lavan's and Bastian's unlawful conduct caused Lockheed Martin to discriminate against Plaintiff on the basis of her race and in retaliation for opposing race discrimination in her employment in violation of state and federal law.

153.     As a direct and proximate result of Defendants Lavan and Bastian's unlawful acts of aiding and abetting discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other harm. Accordingly, Defendants Lavan and

35

Bastian are liable to Plaintiff for pecuniary damages, compensatory damages, back pay, front pay, attorney's fees, costs, and other equitable relief, all as provided for by the Minnesota Human Rights Act.

154.    Accordingly, Defendants are liable to Plaintiff for pecuniary damages, compensatory damages, and damages for harm to her reputation in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

**COUNT IX**

**DEFAMATION**
***(All Defendants)***

155.    Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

156.    Throughout Plaintiff's employment with Lockheed Martin, including in connection with her past performance reviews culminating in her 2017 Performance Review, Defendants have made numerous false and defamatory assertions as statements of fact. The false and defamatory statements include, without limitation, statements that Plaintiff did not communicate with stakeholders more effectively, did not inform others in the legal department on the progress of matters, did not take accountability for matters assigned to her, and did not take responsibility for an adverse jury verdict or undertake measures necessary to mitigate.

157.    Other false and defamatory allegations regarding Plaintiff's handling of certain matters, the details of which Defendant claims comprise confidential information, were made by Defendants Bastien and Lavan. These false and defamatory statements were communicated to others both inside and outside of Lockheed Martin. These factual assertions are false and harmful to Plaintiff's reputation.

158.    On November 13, 2018, Plaintiff filed a charge of race discrimination against Lockheed Martin with the EEOC complaining that Lockheed Martin intentionally discriminated against Plaintiff in Plaintiff's terms and conditions of employment, including but not limited to, Plaintiff's compensation, promotion, opportunities for advancement, performance assessment and other terms and conditions of employment.

159.    On December 7, 2018, Defendants suspended Plaintiff pending what Defendants characterized as an investigation into Plaintiff's use and reference to certain Lockheed Martin documents in pursuing Plaintiff's rights under Title VII the MHRA, including her use of information in her November 13, 2018, charge of race discrimination against Lockheed Martin.

160.    On December 27, 2018, Defendants terminated Plaintiff's employment for the stated reason of "inappropriately disclosing to external third parties Lockheed Martin confidential and sensitive information as well as company attorney-client privileged information."

161.    The Lockheed Martin information that Plaintiff's disclosed was not Lockheed Martin confidential information, was not attorney-client privileged information, and was disclosed only to Plaintiff's attorney and the EEOC. The subject information is indispensable to her claims of race discrimination.

162.    The stated reason for Defendant's termination of Plaintiff's employment was false. The real reason was race discrimination and retaliation in violation of state and federal law.

163.    On information and belief, Defendants have published the false and defamatory reason for Plaintiff's termination to third parties, statements that were not made in good faith, on a proper occasion, from a proper motive, or based on reasonable or probable cause.

164.    The misconduct of Defendants constitutes defamation *per se.*

37

165.    As a direct and proximate result of Defendants' defamation of Plaintiff, Plaintiff has suffered and continues to economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, emotional distress, and other harm.

166.    Accordingly, Defendants are liable to Plaintiff for pecuniary damages, compensatory damages, and damages for harm to her reputation in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

## COUNT X

### INENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Defendants Lavan and Bastian)*

167.    Plaintiff restates and realleges the allegations of each preceding paragraph as if fully set forth herein.

168.    In taking the actions and making the statements set forth above and other actions and statement too numerous to recount here, Defendants Lavan's and Bastian's conduct was extreme and outrageous and caused Plaintiff severe emotional distress.

169.    The conduct of Defendants Lavan and Bastian was intentional or reckless and made with knowledge by them that it would cause Plaintiff severe emotional distress and mental anguish.

170.    As a direct and proximate result of Defendants Lavan and Bastian's intentional infliction of severe emotional distress on Plaintiff, Plaintiff has suffered and continues to emotional distress, mental anguish, economic harm, lost earnings and benefits, embarrassment, damage to reputation, humiliation, and other harm.

171.    Accordingly, Defendants are liable to Plaintiff for pecuniary damages, compensatory damages, and damages for harm to her reputation in an amount to be proven at trial but reasonably believe to be in excess of $75,000.

38

WHEREFORE, Plaintiff requests a trial by jury and that the Court declare and enter judgment against Defendants:

A.      For actual damages, compensatory damages in an amount up to three times the actual damages sustained, damages for emotional distress, back pay and front pay, in an amount to be proven at trial, but reasonably believed to be in excess of $75,000;

B.      For Plaintiff's attorneys' fees, expert witness fees, costs, disbursements, interest, and such other relief that the Court deems just and equitable;

C.      For a civil penalty to be paid to the State of Minnesota as required by Minn. Stat. § 363A.29, subd. 4;

D.      For punitive damages appropriate to the proof at trial;

E.      That Plaintiff be granted leave to amend Plaintiff's complaint to add a claim for punitive damages pursuant to her state law claims; and

F.      For such further relief as the Court deems just and equitable.

**AVISEN LEGAL, P.A.**

Dated:  July 7, 2020

By:  ___/s/ William J. Egan_____
William J. Egan (#0166029)
AT&T Tower Suite 1675
901 Marquette Ave.
Minneapolis, MN 55402
(612) 584-3400 Main
(612) 455-3974 Direct
(612) 437-4830 Fax
began@avisenlegal.com

**ATTORNEYS FOR PLAINTIFF**