1       UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                        )
4    Daniel'La Deering,                 )   File No. 20-CV-1534
                                        )   (DSD/ECW)
          Plaintiff,                    )
5                                       )
     vs.                                )   Minneapolis, Minnesota
6                                       )   June 28, 2023
     Lockheed Martin Corporation,       )   10:00 a.m.
7    et al,                             )   Courtroom 14W
                                        )
8          Defendants.                  )
     ------------------------------------------------------------
9

10

11          **BEFORE THE HONORABLE DAVID S. DOTY**

12          **UNITED STATES DISTRICT COURT JUDGE**

13                  **(MOTIONS HEARING)**

14

15

16

17

18

19

20

21

22               Official Court Reporter:

23          MARIA V. WEINBECK, RMR-FCRR
                  1005 U.S. Courthouse
24               300 South Fourth Street
             Minneapolis, Minnesota 55415
25

```
 1      APPEARANCES:

 2      For the Plaintiff:        CONARD NELSON SCHAFFER
                                  Kaarin Nelson Schaffer, ESQ.
 3                                121 South 8th Street
                                  Suite 1425
 4                                Minneapolis, MN  55402

 5                                AVISEN LEGAL, P.A.
                                  William J. Egan, ESQ.
 6                                901 Marquette Avenue
                                  Suite 1675
 7                                Minneapolis, MN  55402

 8                                INNOVA LAW GROUP, PLLC
                                  Heidi J.K. Fessler, Esq.
 9                                15624 Europa Avenue
                                  Hugo, MN  55038
10
                                  GILBERT LAW FIRM
11                                William A. Gilbert, Esq.
                                  421 West Riverside Avenue
12                                Suite 353
                                  Spokane, WA  99201
13

14      For the Defendants:       MORGAN LEWIS & BOCKIUS LLP
                                  Michael S. Burkhardt, Esq.
15                                Benjamin K. Jacobs, Esq.
                                  1701 Market Street
16                                Philadephia, PA  19103

17
                                  NILAN JOHNSON LEWIS PA
18                                Joseph Schmitt, Esq.
                                  250 Marquette Avenue South
19                                Suite 800
                                  Minneapolis, MN 55401
20

21

22

23
              Proceedings reported by court reporter; transcript
24      produced by computer.

25
```

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3              **(10:00 a.m.)**

4          THE COURT:  Morning, do you all want to take a

5    seat please.

6          This morning we have on our docket the matter of

7    Daniel'La Deering versus Lockheed Martin Corporation, and

8    may I have appearances, please?

9          MR. BURKHARD:  Michael Burkhard on behalf of

10   Lockheed Martin, Joe Schmitt and Ben Jacobs.

11         THE COURT:  I'm sorry, would you turn on your mic,

12   please?  Thank you.  Appreciate that.

13         MR. BURKHARD:  I apologize, Your Honor.  Michael

14   Burkhard, Joe Schmitt and Ben Jacobs on behalf of Lockheed

15   Martin.

16         THE COURT:  Thank you.

17         MS. SCHAFFER:  Good morning, Your Honor.  Kaarin

18   Nelson Schaffer --

19         THE COURT:  Would you turn on your mic also?

20   Thank you.

21         MS. SCHAFFER:  I will get closer.  Kaarin Nelson

22   Schaffer, Heidi Fessler, Bill Egan and Bill Gilbert all here

23   on behalf of Ms. Deering, who is sitting next to me.

24         THE COURT:  Good morning.  The motion this

25   morning, the motion we set to have here is an emergency

1    motion for sanctions and dismissal with prejudice filed by

2    Lockheed.

3            We also have another motion, as I often say, "over

4    the transom."  I used to say that and then people would say,

5    "what do you mean 'over the transom'?"  Most young people

6    have no clue as to what a transom is, so then I spend five

7    minutes describing what a transom is.

8            Back in the old days, the clerk's office always

9    had a little window above the door that was used for

10   ventilation that would often be open, and when we couldn't

11   get things filed on time, we would toss them in over the

12   transom virtually.

13           We got a couple motions or a motion and a

14   response.  It's amazing to me how fast you lawyers can

15   react.  Technology is really wonderful or a real pain in the

16   neck actually for both sides.  I know it is.

17           But, anyway, I'm going to deny the motion for a

18   continuance, and I won't give you the reasons right now.

19   There are a whole number of reasons, but I think it's

20   inappropriate and out of time.  But, in addition, I think

21   there's probably not a real reason to do that because we're

22   going to be focusing purely on the facts of Ms. Deering's

23   employment and that's really the key here.  We're not

24   focusing on any of the other issues of the case.  We're just

25   focusing on that issue because those are the issues brought

1     to the fore by the Motion for Dismissal.

2            So, Mr. Burkhard, I understand you're going to be

3     arguing for the defendant, correct?

4            MR. BURKHARD:  That's correct.

5            THE COURT:  And I think you've talked to my clerk.

6     You know, I limit time.  And, you know, people accuse me of

7     explaining too much.  My kids do especially, too much

8     detail.  My grandchildren say "TMI."  I first learned what

9     TMI was from my great-grandchild.  TMI, too much

10    information.  But, anyway, I just want to tell you that the

11    -- well, let's not go there.  Come on up, Mr. Burkhard.

12           MR. BURKHARD:  I got the gist of it, Your Honor.

13           THE COURT:  And what I was really going to explain

14    is why we're limiting it to so much time.  You know, I was a

15    lawyer for so long, and I always found out if I was limited

16    in time I gave better arguments, and I find the same thing

17    is true here when I limit the lawyers' time, they focus

18    instead of giving me a whole lot of stuff that I don't want

19    to hear about or know about, and they focus in.  I know

20    you're going to do that.

21           So if you would please, I've read the materials

22    that both parties have provided.  I think I know what the

23    issue is before us.  I thought I maybe explained it

24    succinctly a minute ago.  And so I don't want to hear about

25    the issues in the case other than what we're dealing with

 1    here this morning on this particular motion, so go ahead,

 2    please.

 3            MR. BURKHARD:  Thank you, Your Honor.  Again,

 4    Michael Burkhard on behalf of Lockheed Martin.

 5            THE COURT:  And make sure, one of the things I

 6    find, new lawyers, back when I was a young lawyer 150 years

 7    ago, we didn't have microphones, and we had to -- if we had

 8    to have a judge, and I had a judge that was totally deaf,

 9    Gunnar Nordbye was his name.  I don't know if some of you

10    know that name in history.  But Gunnar was totally deaf.  I

11    talked to him like this, and the court reporter was sitting

12    right in front of me about as far away as the table is, and

13    said, "I can't hear you."  And I knew what he was saying.

14    You've got to talk louder because Gunnar is not hearing you,

15    so I have a service connected disability.  If you talk nice

16    and loud, I can hear you with the microphones just fine, but

17    if you would do that, please.  Thank you.

18            Now, we haven't taken your time away.  This is

19    just explanation.

20            MR. BURKHARD:  Only five seconds, Your Honor.

21            THE COURT:  Okay.  Go ahead.  Well, we'll give

22    that you at the tail end because you saved some time for

23    rebuttal.

24            MR. BURKHARD:  I did.  I reserved five minutes,

25    Your Honor.

1             THE COURT:  All right.

2             MR. BURKHARD:  All right.  Thank you, Your Honor.

3     Again, Michael Burkhard on behalf of Lockheed Martin.

4             Your Honor, cutting right to the chase of the

5     motion that we filed.

6             THE COURT:  Good.

7             MR. BURKHARD:  We filed this motion because what

8     Lockheed Martin learned around the time that the trial

9     exhibits for this case were being presented, the list, and

10    then, ultimately documents per the Court's order, first

11    listed on June 5th and then actual documents showing up on

12    June 7th, we learned for the first time that Ms. Deering had

13    in fact secured employment at a different company in which

14    she had represented to us throughout discovery, and that

15    company's name is Anaplan.  The prior company is nVent.

16            It's important to bear those two things in mind

17    because it turns out there are two different moments of

18    perjury in her deposition.

19            The first that started with our motion was to

20    learn that Ms. Deering who was deposed on November 1st,

21    2021, under very simple questions by myself as to whether

22    she had engaged in any additional job efforts since she had

23    started working at nVent, and the answer was no.  There was

24    no mention of Anaplan.  We had never been produced any

25    documents.

1              Now, what we learned after we filed our motion on

2      June 22nd, plaintiffs made an additional production of

3      documents that included pay stubs from nVent.  When we

4      looked at those pay stubs, and we'll show those to you in a

5      moment, Your Honor, the pay stubs clearly show in the last

6      page of the document that, in fact, Ms. Deering's last day

7      of employment at nVent was October 22, 2021.  Nine days

8      before her deposition.

9              So in her deposition as she sat there answering

10     these questions, she knew, one, she was no longer employed

11     at nVent; and she knew, two, that she had already signed an

12     offer of employment at Anaplan on October 12th of 2021, and

13     she was scheduled to start employment on November 8th.

14             We submitted the deposition testimony of the

15     questions where I asked Ms. Deering in detail twice, "did

16     you ever look for any alternative employment once you

17     started working for nVent?"  And there's a little context

18     that's important.

19             They presented interrogatory responses.  We asked,

20     as we detail in our papers for, tell us all of your

21     employment efforts post-Lockheed Martin.  In their first

22     response, which was December of 2020, they submitted a chart

23     that listed a bunch of jobs that purportedly Ms. Deering had

24     been applying to.  They never supplemented that chart, but

25     they did supplement their interrogatory responses in March,

1    and they were verified in April.  Nothing had changed.

2           When I got to the deposition, one of the things I

3    was exploring is the chart itself.  We saw a lot of flowerly

4    language in plaintiff's counsel's opposition suggesting I

5    was scrolling through a document too quickly.  And they

6    submitted the video, Your Honor, and I was accused of

7    grilling Ms. Deering after the lunch break.  And it's

8    possible, I've been accused of grilling a witness from to

9    time in a deposition, Your Honor.  But there's no way anyone

10   with a straight face can look at the video and think that I

11   was grilling Ms. Deering in that section of the deposition.

12   I merely was asking her, "do you see this chart?  The last

13   date on this chart is December 13, 2020.  What I want to

14   know is did you look for additional work after 2020?"  Her

15   response was, "well, I didn't start working for nVent until

16   February of '21."

17          So my next two questions to her, and this is

18   detailed on page 7-8 of our opening brief was, "okay, did

19   you look for additional work after you started working for

20   nVent?"  She said, well, I'm not sure, I might have applied

21   for a couple between December and February."

22          I said, "okay, you might have applied for a couple

23   of positions between December and February, but is it

24   correct that you didn't look for any other work or seek

25   alternative employment after February or '21?"  Answer,

1    "that is correct."

2          That was a lie.  As it turned out, she did, and

3    she secured a job.  That job she was making more money, more

4    lucrative than the nVent job, and she did not disclose that

5    information despite a supplemental document production on

6    October 29th, two days before her deposition, and three

7    supplemental productions after her deposition, two in

8    November and one in March of 2022.  No documents about

9    Anaplan at all.

10          And in her deposition, there's no confusion about

11   the question that I asked her.  There's no argument that she

12   was confused or didn't understand the question.  There was

13   no objection from her counsel to any question that I asked

14   as if it was confusing or vague.  And on December 1st, she

15   signed an errata sheet and made no changes at all, which is

16   attached to our reply brief, Your Honor.

17          What we learned in addition is as I mentioned

18   earlier is that when she started in her deposition, her last

19   day at nVent had already completed.

20          Joe, do you want to show that?  Mr. Schmitt, if he

21   could, Your Honor, put that pay stub up.

22          And I would point out as he's doing that, Your

23   Honor, these documents are the final pay stubs from nVent.

24   Plaintiff's counsel had provided some pay stubs back in July

25   of '21.  They never supplemented, and there's nothing in any

1     of their filing to suggest they ever --

2              THE COURT:  By the way, are you seeing that on

3     your screens?

4              MS. SCHAFFER:  We are, Your Honor.

5              THE COURT:  Okay.

6              MR. BURKHARD:  Your Honor, can I just step to the

7     table?  Well, I can see this fine.

8              THE COURT:  If you carry the microphone with you,

9     you can.  I need you to talk to into a mic.

10             MR. BURKHARD:  Your Honor, what I would point to,

11    you can see the highlighted portion of the pay stub.  It

12    shows October 16th to the 22nd as the final salary.  This is

13    the last and final page of any pay stub documentation, and

14    it shows salary pay-off.  I mean vacation pay-out.  That is

15    her last date of employment.  There is no more compensation

16    from nVent beyond that date.  There is no argument to

17    suggest that she was still employed when she sat at her

18    deposition.

19             The very first question I asked her, moments after

20    she was sworn in to tell the truth, after she confirmed she

21    was not on drugs or alcohol that would prevent her from

22    testifying truthfully, I asked her a very simple question,

23    "where are you currently employed?"  Answer: "NVent."

24             I didn't stop there.  I wanted to know what are

25    your job duties?  What are your current role?  She waxed

1    poetic about being on the leadership team and all the roles

2    and important duties that she had, all attached in our reply

3    brief because we didn't know that fact until June 22nd when

4    we finally got copies of these nVent pay stubs that

5    confirmed she was no longer working there on November 1st.

6          Those two acts alone are enough for this court to

7    dismiss with sanctions, but there's more because the

8    original interrogatory that was supplemented in March of '21

9    and listed all the jobs she was in, listed her as working as

10   a contract lawyer.  It didn't even list nVent.  She had been

11   working there for two months.  She signed a sworn

12   verification in April of '21 that that was true.

13         They never told us she was working at nVent.  My

14   partner Ben Jacobs found it on social media, and we had to

15   confront them in the summer and get records from nVent.  The

16   entire time knowing that at that point she was caught, and

17   she had to testify, yes, I worked at nVent, and then she

18   doubled down by hiding the Anaplan information and then

19   doubled down again by not disclosing it, then doubled down

20   again in opposing our summary judgment motion.

21         She attached her own declaration, which attaches

22   her resume.  That resume says for employment "nVent to

23   present."  That is four months after she had started working

24   at Anaplan.  That was submitted.

25         We went to two settlement conferences with an

1    obligation for them to present confidentially, of course, we

2    didn't get to see it, but a legitimate damages analysis that

3    was accurate.  They clearly didn't do that.  As Mr. Egan

4    admitted in his response, I had the numbers wrong.  It's not

5    just the numbers wrong.  If they're operating on Anaplan

6    documents, that wasn't disclosed.

7         We detailed in our brief to Judge Thorson that she

8    was working at nVent, so there's no way they mentioned

9    Anaplan in those documents, and they presented the wrong

10   calculations, which reduced her mitigation.  When they

11   should have and did know and certainly one person knew, and

12   that person was Danny Deering.  In every step of the way,

13   arguments to blame her lawyers.  We've cited Eighth Circuit

14   case law, Supreme Court case law.  That is not sufficient.

15   You do not get excused by blaming your lawyers.

16        We cited Eighth Circuit on point cases that a

17   lawyer, a 25-year employment lawyer who has experience in

18   the system, who is willing to commit perjury in her

19   deposition, who is willing to say, "I produced everything I

20   had," even though that wasn't true, also detailed in our

21   reply brief as we discovered from the nVent documents, that

22   if you're going to engage in that conduct and numerous

23   discovery abuses throughout the process, the appropriate

24   sanction is dismissal.

25        THE COURT:  Do you want to finish up your thought?

1    And then if you left something behind here, you can cover

2    because you're going to get some rebuttal.  Okay?

3                MR. BURKHARD:  Thank you, Your Honor.

4                THE COURT:  Thank you.  Ms. Schaffer, why don't

5    you come on up, if you would, please.

6                The question I have of you and really in general,

7    because after reading all of this material, and now hearing

8    Mr. Burkhard's argument, is there any facts about when the

9    employment occurred and didn't occur and so forth?  Are

10   there any facts that you take issue with?  Let me know about

11   that, if you do.

12               And then would you let me know when you knew about

13   that she was working, that Ms. Deering was working for

14   Anaplan.  When did you learn that?  And how did you learn

15   that?  You know, because you've been in this case not for

16   the full-time, but I want to know what you knew when you

17   knew it about her work at Anaplan.  Okay?

18               And if you could, exactly when nVent ended, you

19   know?  Those are the two crucial things I think that we're

20   looking at.  So if you would include that in your, and, you

21   know, I haven't taken any of your time.  So I would like you

22   to include those answers in your comments, if you would.

23               And, you know, you don't have the burden here.  The

24   burden is on the defendant obviously, and so they're going

25   to get rebuttal and you don't, so make sure you tell me

1    everything you have totally.  Okay.  Thank you.  Go ahead.

2            MS. SCHAFFER:  I will do my best, Your Honor.

3    Thank you.

4            Your Honor, I want to start by highlighting what

5    we said in our motion, which is critical, which is that I

6    believe that the lawyers in this case have a conflict.

7            THE COURT:  Make sure you talk into the

8    microphone.  As I say, you know, and I hate to say this, my

9    hearing loss is on upper levels, so, unfortunately, I hear

10   lower levels better.  So if a man has a high voice, I don't

11   hear him as well.  Likewise, if I woman is speaking, and

12   then she has a lower voice.  You have an medium voice, so if

13   you would just give a little more oomph so I can hear,

14   because I do want to hear every word you say.

15           MS. SCHAFFER:  Thank you, Your Honor.

16           I want to start by highlighting that we do have a

17   conflict in this case.  The motion and the reply brief that

18   the defendant has submitted does raise a question.  It

19   essentially did Ms. Deering intentionally do something

20   and/or did her lawyers intentionally do something or make

21   mistakes?

22           And the proper defense for Ms. Deering in much of

23   this or an appropriate defense is that it was the fault of

24   her lawyers, which, of course, puts our personal interests

25   at issue and against Ms. Deering.  Obviously, I'm prepared

1    to argue this morning, Your Honor, but I want to make clear

2    that that's our position, and Ms. Deering has not waived

3    that conflict today.

4              THE COURT:  And I understood that, but I'll say

5    we're not going to that issue this morning.  There's going

6    to be later discussions and whatever happens from here on

7    in.  But I want to make sure that you get a chance to talk

8    about what we're dealing with this morning, which is, you

9    know, and it's very clear I think from the facts that I've

10   been told and recited and then have been found in the

11   deposition and other things that Ms. Deering took personal

12   interest in this and also made personal statements, signed

13   off on personal declarations, and was in a deposition taking

14   her deposition.

15             And so the lawyers were there, a lawyer was there,

16   but the obligation of a lawyer doesn't necessarily extend,

17   you know what the obligation of a lawyer is.  We don't want

18   to get into that today, so just talk about what we're

19   dealing with here today, which is those facts I've laid out.

20   When did she leave nVent?  When did she start work at

21   Anaplan?  Those are crucial times, and I think they kind of

22   set the stage for the motion that the defendants are making,

23   but go ahead if you would.

24             MS. SCHAFFER:  Understood, Your Honor.

25             THE COURT:  By the way, we pause the clock.  My

 1    clerk is very good at this, so if she catches me talking,

 2    she normally pauses, so.

 3              MS. SCHAFFER:  Thank you, Your Honor.

 4              In response to the very specific questions that

 5    Your Honor is asking, with respect to nVent, Ms. Deering's

 6    last day actually working at nVent we believe was around

 7    October 22nd, but with all due respect, have been unable to

 8    confirm that.

 9              THE COURT:  Well, but you saw the document they

10    were shown, do you disagree with that document?  Do you

11    think it's wrong and not correct?

12              MS. SCHAFFER:  We do not disagree with that

13    document.  We produced that document, Your Honor.

14              However, Ms. Deering's understanding at the time

15    of her deposition was that she was on vacation from nVent,

16    and part of the reason that that extended beyond the pay

17    stub is because she had been given a sign-on bonus, part of

18    what she was required to repay, so her understanding was

19    that part of the repayment of that bonus was essentially

20    coming off of her vacation time.  So at the time of her

21    deposition, Ms. Deering understood that she was still an

22    employee of nVent.

23              And, Your Honor, right now, she's in a similar

24    situation with Anaplan, slightly different, but she's been

25    laid off from Anaplan.  Her last day of employment, her last

1    day of actually showing up for work will be different than

2    her last day of being an employee at Anaplan.

3         THE COURT:  Well, what is your -- I was going to

4    use a more -- what is your view as to when she left

5    employment of nVent?  When did you, number one, what is your

6    view and when did you find out about it?

7         MS. SCHAFFER:  Your Honor, I'm not sure I can

8    provide my personal view because I wasn't a lawyer on the

9    case at the time.

10        THE COURT:  I understand, but I want your view

11   because, you know, unfortunately, the lawyers have made --

12   the lawyers have made the lawyer's knowledge an issue and

13   that's why I really want to get it squared away.  And,

14   frankly, I'm not here to prosecute lawyers.  I don't want to

15   do that.  I don't like to do that.  I'm not going to do that

16   this morning for sure.  If I have to later on, we'll do it,

17   but that's something not today.

18        So just tell us your view when you knew and what

19   you knew about the nVent and then Anaplan also.  Not the end

20   of Anaplan we're worried about so much, the beginning of

21   Anaplan is most important here.

22        MS. SCHAFFER:  Sure.  So I'm going to skip ahead

23   to the Anaplan question, and I'm happy to go back to nVent

24   if it doesn't answer Your Honor's question.

25        THE COURT:  You know that one, right.  Okay, all

1    right.  Go ahead.

2         MS. SCHAFFER:  So, Your Honor, I didn't come into

3    this case until the very end of October of 2022, and at the

4    time that I came into the case, I don't remember the moment

5    that I learned that Ms. Deering was working for Anaplan.  It

6    was just to me general knowledge.  We talked about it openly

7    and when I came into the case, my understanding was that

8    discovery had been supplemented and was up to date, and it

9    was literally just not a question.

10        THE COURT:  Okay.

11        MS. SCHAFFER:  So when I received a call from

12   Mr. Schmitt on June 7th, I learned for the first time that

13   the defense didn't know about Anaplan.  And the mistake that

14   I raise in the brief that I made on May 25th, part of the --

15   I'm not trying to excuse my mistake, but I had a bit of a

16   blind spot because I did not know that the defense didn't

17   know about Anaplan, and part of that is because we talked

18   about it openly.

19        THE COURT:  When you say "we talked about it

20   openly", you and Ms. Deering?

21        MS. SCHAFFER:  Me and Ms. Deering, Mr. Egan, and

22   Ms. Fessler knew that she was working at Anaplan at the time

23   that I was involved, and it was just not a question.  Nobody

24   ever told me not to tell.  Nobody ever told me not to

25   produce documents.  It just wasn't on my radar as an issue

 1     at all.

 2                  THE COURT:  Okay.

 3                  MS. SCHAFFER:  Does that answer that particular

 4     question, Your Honor?

 5                  THE COURT:  I think that's the best answer you can

 6     give.  I think it works, okay.

 7                  Do we have an nVent?  Any difference?  I know you

 8     kind of gave me a version of how nVent ended.  Do you have

 9     any different version of how nVent ended?

10                  MS. SCHAFFER:  I don't, Your Honor.  That is what

11     I understand from the record and from Ms. Deering.

12                  THE COURT:  Okay.  All right.  Go ahead with the

13     rest of your argument then.  Thank you.

14                  MS. SCHAFFER:  Thank you, Your Honor.

15                  I do want to back up a little bit.

16                  THE COURT:  Okay.

17                  MS. SCHAFFER:  Because as attorneys, our job is to

18     shepherd our client through this process.  That's what we

19     do, and that is our job as the lawyer, whether our client is

20     herself a lawyer, whether our client is an executive,

21     whether our client is a garbage man.  That is our job.  And

22     our job is to prepare her.  Our job is to review documents

23     thoroughly with her.  Our job is to know what she's afraid

24     of when she goes into her deposition or when she is going

25     into a hearing, and our job is to correct her mistakes.  Our

1    job is to be paying attention so that when our client makes

2    a mistake, we catch it, and we correct the record.  And in

3    this case, that did not happen.

4          In this case, it is -- there have been mistakes.

5    Ms. Deering has made mistakes, and her lawyers have made

6    mistakes, but it was the job of her lawyers to correct the

7    mistakes.

8          Now, Your Honor, I do want to walk through the

9    allegations raised in the defendant's reply brief.

10          THE COURT:  Please do.

11          MS. SCHAFFER:  We requested a surreply, but they

12    raise a number of things that they say are evidence that Ms.

13    Deering was not being truthful.

14          For example, I'm just going to go through the

15    bullet point list that is from the reply brief, and I'll be

16    as quick as I can.

17          They say that she served supplemental

18    interrogatory responses.  That was something that her lawyer

19    did, and it is true that a client is supposed to look at

20    that stuff and supposed to make sure it's true, but she

21    can't be held to a higher standard because she's a lawyer.

22    She's a client and she is supposed to be able to trust that

23    her lawyers are paying attention, are aware of what all of

24    the documents say and are submitting accurate documents.

25          THE COURT:  I'm not sure if the courts make the

1    distinction you just did.  I think the courts give a

2    lawyer-client more responsibility than a non-lawyer client

3    because a lawyer-client understands what's happening.  You

4    know, non-lawyers don't understand anything really most of

5    the time.  And so I think the courts have looked -- and tell

6    me if I'm wrong about my assumption about what the courts

7    have decided as to lawyer-clients and their obligation to

8    make sure that what they say and do is correct.

9            MS. SCHAFFER:  Your Honor, I'm not aware of a

10   specific case on this issue.

11           THE COURT:  Well, I asked Mr. Burkhard.  He may be

12   or if he's not, maybe I'll have to correct my view of the

13   law, but whatever.  Go ahead.

14           MS. SCHAFFER:  Understood.  Either way, Ms.

15   Deering is the client in this case, and so her lawyers

16   should be held to the standard of lawyers, which is to make

17   sure that things are accurate before they send them out.

18           Then she failed to provide documents to her

19   counsel in October of 2021 about Anaplan.  Ms. Deering

20   provided documents to her lawyer about Anaplan.  Just

21   because her lawyer didn't produce them doesn't mean that Ms.

22   Deering didn't provide them to her lawyer.

23           In terms of what happened in her deposition, Ms.

24   Deering made some misstatements.  Some mistakes that her

25   lawyer who was there should have and could have corrected,

1    and had he corrected them at the time, we most likely

2    wouldn't be here.

3         And then they raised that she submitted a sworn

4    declaration with her resume in March of 2022.  So the resume

5    that Ms. Deering submitted was for the proposition that her

6    work -- essentially to show her work history.  She didn't

7    say, "this is my current employer, see my resume."  She

8    said, "see my work history," and that's what it was.  We all

9    have resumes that -- my current resume probably doesn't have

10   my current employer on it.

11        THE COURT:  But I hope you wouldn't respond to

12   requests about where you're working by sending that resume

13   in, would you?  When you know that it may not be totally

14   accurate?

15        MS. SCHAFFER:  Of course not, but that wasn't the

16   question that was being asked.

17        THE COURT:  Okay.  All right.

18        MS. SCHAFFER:  She was submitting it for the

19   purposes of her work history.  And, again, her lawyers knew

20   at the time that that was submitted that she was working for

21   Anaplan.  And what should have happened is a lawyer would

22   have looked at that and said why don't you add Anaplan to

23   your resume.

24        And then in terms of the two settlement

25   conferences and the damages calculation, Your Honor, the

1    damages calculation is the one I can speak to the most

2    clearly because it's the one that I did.  And as I said in

3    my declaration, we have attorney-client communications that

4    I would feel more comfortable sharing in camera because I

5    don't have any interest in waiving the attorney-client

6    privilege, but they will show that Ms. Deering was not

7    attempting to hide Anaplan when I submitted that May 25th

8    damages calculation.  And, in fact, it was my mistake.  I

9    made a miscalculation and the documentation showing our

10   communication will support that.

11             Your Honor, the Court has the discretion to issue

12   whatever remedy the Court sees is appropriate in this case.

13   And in this case, dismissal simply isn't proper.  There have

14   been mistakes.  There have been mistakes that we have

15   attempted to correct as soon as we realized what the

16   mistakes were, and there are other remedies available to

17   Your Honor, but in this case, the issue relates to damages,

18   and it's not about the question of liability.  It doesn't go

19   to the ultimate question, which is whether or not Ms.

20   Deering was retaliated against.  It's a question about a

21   number.  The number that a jury would award Ms. Deering if

22   they found she was wrongfully terminated.  And in an effort

23   to try to correct the mistakes, we hired a forensic

24   economist.  We've offered that economist to the defense.

25   We've offered Ms. Deering to the defense for another

1    deposition.  And I understand their position that it's too

2    little too late but that is the remedy.  It does cure the

3    mistake, and we'd like to be given the opportunity to do

4    that.

5         It is Ms. Deering's most precious right to be able

6    to appear in front of a jury and to be able to argue this

7    case in front of a jury on the merits.  And the question

8    before that jury is was Ms. Deering retaliated against when

9    she filed a complaint with the Equal Employee Opportunity

10   Commission?  We expect that the jury is going to say yes to

11   that question, and the issue of damages is a different

12   question.  Your Honor could impact the question of damages

13   in a sanction.  We could all be given an opportunity to hire

14   experts.

15        In this case, frankly, experts should have been

16   brought in from the very beginning.  It's a high value case

17   with complications like RSU's and different employers and

18   things that, frankly, confused me, which is part of the

19   problem with my May 25th error.

20        And so we would ask that this Court continue the

21   case as has already been done, reopen discovery for the

22   limited purpose.  We will provide the defense anything else

23   that they think they need even though we believe we've

24   produced everything.  We will provide them with our expert

25   or their own if the Court will allow.  We will allow

1    depositions to ensure that this issue is corrected, that the

2    defense is given a full opportunity to understand Ms.

3    Deering's damages and so that Ms. Deering is given her full

4    opportunity to present her case to a jury.

5              Unless Your Honor has questions, I have nothing

6    further.

7              THE COURT:  Thank you.

8              MS. SCHAFFER:  Thank you, Your Honor.

9              THE COURT:  Let me just add one comment.  You know

10   about the concept of Rule of Law.  And the concept of Rule

11   of Law means that we here apply rules across the board no

12   matter who it is or why or what, but we do apply rules and

13   we expect the rules to be followed.  You understand that.

14             MS. SCHAFFER:  I do, Your Honor.

15             THE COURT:  I hope you understand the implication

16   of my statement.

17             MS. SCHAFFER:  I do, Your Honor.

18             THE COURT:  All right.  Thanks.

19             Mr. Burkhard, you've got five plus two minutes.

20   I'm going to give you seven.  Do you want to put seven on

21   the clock because Mr. Burkhard complained that I took two of

22   his minutes, so I want to be fair to both sides.  Okay.  Go

23   ahead, please.

24             MR. BURKHARD:  Thank you, Your Honor.

25             Your Honor, I try to avoid hyperbole in these

1    circumstances but, frankly, the explanation about nVent is

2    preposterous.  The pay stub records are clear.  She got

3    paid, and she only worked until October 22nd.  It also

4    reflects that she got paid for her vacation, which was the

5    16th through the 22nd.  The check date on that document is

6    October 29th.  There is no additional documentation.  There

7    is nothing anywhere to suggest, oh, I've got a sign-on bonus

8    I have to pay.  I thought it was still working.  And, more,

9    Your Honor, even if she thought that, what exactly was she

10   explaining when I asked her what her current job duties are,

11   if she was sitting on vacation and she knew she had already

12   resigned her employment, she was not going to be there, why

13   was she talking about her current job duties?  It's all a

14   lie.

15           And none of that excuses the first lie, which is

16   what job efforts did you engage in after December 2020?  You

17   see it at page 7 of our opening brief, and I list out the

18   testimony.  I'm not scrolling through a document.  There's

19   no confusion there.  I simply asked her, "okay, which job

20   efforts did you engage in after December '20?"  "I'm not

21   really sure.  I started at nVent February 21st."

22           I said, "okay, did you search for any jobs after

23   February 21st?"  "No."  I asked her again, "so it's correct,

24   even though maybe you applied for a couple of positions in

25   between, you did not search for another job after

1    February 21?"  "That is correct."  She signed an errata

2    sheet a month later confirming her so-called testimony with

3    not one change to the deposition.

4            Now, Ms. Nelson says with respect to the

5    interrogatories that were supplemented previously, March of

6    '21, it's not her fault.  That's the lawyers' fault.  No,

7    it's not.  Ms. Deering, as the client, whether you apply a

8    different standard or a higher standard or not, and I'll

9    come back to that in a moment.  She, as the client, verified

10   those interrogatories under oath in April of '21 that listed

11   her as a contract lawyer not even listing nVent as her

12   employer.  That's another act of perjury.  Every step of the

13   way the design was let's hide the mitigation.  Let's hide it

14   in March of '21 because it shows I actually got a job making

15   around 200,000.  Then when I got to the deposition, let me

16   hide that I got a more lucrative job.  And she got the offer

17   October 12th.  She signed the employment October 12, 2021.

18   Is it even credible to argue she was being truthful when she

19   said I work at nVent and here are my duties, and I had not

20   engaged in any job efforts, even though she had signed an

21   employment agreement three weeks before her deposition?

22   That's not a memory issue.  There's no I'm exhausted, I

23   can't remember where I work.

24           She testified it was disheartening and exhausting

25   to apply for jobs and not be able to get one.  She just got

1  a very lucrative job with 500,000 RSU's three weeks earlier

2  and that wasn't disclosed.  That's not her lawyers.  That's

3  her.  Okay.

4       There is spending put on the declaration with her

5  resume.  Well, maybe it's not up to date.  You're submitting

6  a resume to the Court detailing your employment experience,

7  and you know you testified in your deposition and didn't

8  mention Anaplan, so, of course, you submitted a resume that

9  says nVent to the present.  That's March of '22.  Sworn

10  declaration, not true.  To this court.  Settlement memos,

11  not true, using the wrong numbers.  Ms. Deering saw those

12  documents.

13       Ms. Nelson tries to explain it was her mistake

14  that in the disclosure, the first time the plaintiff ever

15  provided a calculation of damages, May of '22, a month

16  before the trial, and as Ms. Nelson just said, they had all

17  kinds of conversations about it.  Ms. Deering is intimately

18  involved in it.  There's one person that knows the numbers

19  that were submitted to the judge that are wrong, it's Ms.

20  Deering.  She knows what she was earning.  She knows what

21  bonus she got at Anaplan.  She knows the RSU's that she had

22  received and what had vested.  She's aware of all of that,

23  yet a disclosure document comes to us in May that doesn't

24  send any red flags, doesn't say anything about Anaplan.

25       Ms. Nelson says the first time she learned about

1    that was June 7th, not really true.

2           On June 5th, when they submitted their exhibit

3    list, mind you no Bates numbers on those -- on that list,

4    Anaplan offer listed on there.  We raised the issue and

5    said, wait, a second, we never got this document.

6           We had also earlier met and conferred, Your Honor,

7    about our motion in limine in which we said we're going to

8    move to exclude any evidence of damages beyond November of

9    '21 because they never updated anything related to her

10   compensation.

11          If they had actually produced these documents or

12   that everyone knew she was at Anaplan, wouldn't the first

13   thing out of her mouth then, that's not true, of course we

14   did.  Even when they slipped in a 50th exhibit, which was a

15   special new exhibit that was not even on their list on

16   June 5th, on June 7th, all these compensation documents they

17   never produced, her tax returns, her W-2's that she had in

18   her possession way before June 7th of 2023.  Just hand them

19   over, not even on the list of exhibits, as if everybody

20   knows it's just common knowledge that she was at Anaplan.

21          Well, it's not common knowledge when you ask a very

22   simple question to a deponent, who is a lawyer, and she lies

23   to your face that she didn't engage in any job efforts after

24   February of '21, even though she had just signed an offer

25   letter three weeks earlier.  There's nothing that we could

1    have known about that.  There's no way we could have known

2    that in fact she was not working for nVent anymore until

3    June 22, 2023, when we finally got the final nVent pay

4    stubs, which were never produced, never shared.

5         You'll see, Your Honor, Eighth Circuit, the *Carey*

6    case.  It specifically addresses the fact that the two

7    individuals in that case were lawyers.  It noted that fact

8    in analyzing under the facts and under your inherent power

9    that, yes, if you're going to engage in these kind of

10   abuses, the Court, the proper sanction is dismissal because

11   if you don't dismiss, there's no way to punish and deter

12   behavior, and certainly, we should be deterring such

13   behavior from lawyers, but all the other cases we cited,

14   they're not even lawyers and they still dismissed.

15        The *Knapp* case we detail in our opening brief, now

16   not a lawyer, unsophisticated, uneducated party, but lied in

17   her deposition, lied in her interrogatories, didn't produce

18   documents.  Lawyers fault doesn't matter.  Supreme Court and

19   Eighth Circuit says you don't get to hid behind your lawyers

20   mistakes.  You choose your lawyers.  That's the system of

21   justice that we have.

22        If the sanction of dismissal is not granted, then

23   this kind of conduct, there's no way to deter it.  There's

24   no way to undue the prejudice to Lockheed Martin at this

25   stage in the proceeding, Your Honor.  And we've cited

1    numerous cases in Eighth Circuit and outside that support

2    that proposition, and the plaintiffs have cited not one

3    analogous case, not one that involves perjury and these

4    kinds of discovery abuses that did not grant dismissal with

5    prejudice.  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you.

7              Well, I appreciate the comments of counsel.

8    They've been helpful.  Not totally so, but we can't help

9    that, but I'm going to take this under advisement, and we'll

10   let you know soon because I know both parties are interested

11   in what in the outcome the reaction to the motion itself, so

12   we'll let you know soon.  The Court is going to stand in

13   recess now.  Thank you.

14                  (Court adjourned at 10:42 a.m.)

15                      *       *       *

16                  **REPORTER'S CERTIFICATE**

17             I, MARIA V. WEINBECK, RMR, FCRR, certify that the

18   foregoing is a true and accurate transcript of my

19   stenographic notes, and is a full, true, and complete

20   transcript from the proceedings produced to the best of my

21   ability.

22

23             Certified by:  *s/ Maria V. Weinbeck*
                              Maria V. Weinbeck, RMR-FCRR

24

25